Argued March 3; affirmed April 19; rehearing denied May 17, 1938

IN RE LILLY'S ESTATE
CLUNIS ET AL. *v.* THOMPSON ET AL.
(78 P. (2d) 567)

Department 1.

*Lida M. O'Bryon,* of Portland, for appellants.

*George J. Perkins,* of Portland, for respondents.

KELLY, J.  Lucy J. Lilly, nee Clunis, was born February 15, 1866, in Pictou county, Nova Scotia. Her first husband was Herbert Blair who died in 1908. About January 1, 1911, she came to Portland, Oregon, where she resided until her death. On November 14,

1912, she married Benjamin Franklin Lilly. He died on August 26, 1936.

Contestants are children of John George Clunis, now deceased, who was a brother of Mrs. Lilly. They are George Melville Clunis and John Willoughby Clunis of Pictou county, Nova Scotia, and Margaret Ethel Clunis of Brookline, Massachusetts.

Contestants charge mental incapacity on the part of Mrs. Lilly at the time of the execution of her will; undue influence on the part of proponents, Frank Thompson and Margaret Thompson; and that said will was not and is not in truth and in fact the will of the said Lucy J. Lilly.

On the 22d of August, 1936, Mrs. Lilly was stricken with paralysis affecting her larynx and her left arm. On the 29th day of September, 1936, she was confined to her bed.

Dr. Joseph McChesney was Mrs. Lilly's attending physician before, at the time of, and subsequent to, the making of the will in suit. This physician has been engaged in the practice of medicine since 1881. His testimony is to the effect that a few days prior to September 29, 1936, Mrs. Lilly told him that she desired to make a will by which she would leave all her property to Mr. and Mrs. Thompson and that she asked him to prepare such a will for her. Dr. McChesney told Mrs. Lilly that he would not prepare such a will but would have it prepared by a lawyer. Pursuant to this arrangement Dr. McChesney requested Mr. George J. Perkins, a thoroughly reputable lawyer, to prepare such a will. Mr. Perkins prepared the will and either transmitted it by mail or gave it to Dr. McChesney. Dr. McChesney took the will to Mrs. Lilly. Mr. and Mrs. Frank Thompson, Mr. B. G. Bell, Mr. H. E. Thompson and Mrs. Gladys Marie Reed, nee Thompson, testified in effect

that on the 29th day of September, 1936, Mrs. Lilly made it known that she was desirous of making her will and produced the will in suit from under her pillow. Mrs. Thompson gave Mrs. Lilly a pencil and then Mrs. Lilly requested Mrs. Thompson to assist her in signing the will. Mrs. Thompson was overcome by her emotions and began to cry. Mrs. Reed, who was then Miss Thompson, offered to assist Mrs. Lilly in making her signature and this offer was accepted by Mrs. Lilly. Mrs. Lilly was propped up in bed with two pillows at her back, her knees drawn up and upon them there was a magazine upon which the will rested while Mrs. Lilly signed it. Mrs. Reed, nee Thompson, sat upon the bed, placed her left arm around Mrs. Lilly and with her right hand clasped over Mrs. Lilly's hand assisted Mrs. Lilly in signing the document in suit. Before the will was signed Mr. Frank Thompson, at the request of Mrs. Lilly, read the will out loud so that Mrs. Lilly and all who were at her bedside heard it. After the will was signed in the manner above stated, the two attesting witnesses signed it.

These five witnesses, who were at the bedside of Mrs. Lilly, when the will was signed, testified that at that time Mrs. Lilly was mentally alert and in full possession of her faculties. Dr. McChesney also testified to the same effect.

While Mr. Lilly died on August 26, 1936, he was not buried until September 28, 1936. On that day Mr. E. L. Miller called at the Thompson home where Mrs. Lilly was being cared for and Mrs. Lilly recognized him, referring to him as her "boy friend", which had reference to her former use of that term in jest.

Mrs. O. Blair also called at the Thompson residence on that day and Mrs. Lilly asked for a newspaper which Mrs. Blair handed to her. Mrs. Lilly also asked the

time of day. While Mrs. Blair was there, Mrs. Lilly also asked Mrs. Reed, then Miss Gladys Thompson, for a drink of water; and made the remark to Mrs. Blair that Mr. and Mrs. Thompson were "all she had left now".

To overcome the effect of the foregoing testimony as to testamentary capacity on the part of Mrs. Lilly, contestants refer to the fact that on September 10, 1936, Dr. McChesney verified a petition for the appointment of a guardian for Mrs. Lilly in which it was stated that Mrs. Lilly was physically and mentally incapacitated; that on the 24th day of September, 1936, Mr. Perkins, as attorney for Dr. McChesney, secured an order appointing the doctor as such guardian.

For some time prior to August 22, 1936, Dr. McChesney had been in attendance upon Mr. Lilly. Mrs. Lilly was afflicted with "Bright's disease" and the attendant complications, besides having a chronic ulcer upon one of her limbs. Mr. and Mrs. Lilly only occupied the house in which they lived. It was scantily furnished. In fact, they were miserly. Mr. Lilly's condition became so serious that Dr. McChesney deemed it his duty to apprise Mrs. Lilly that her husband could live but a few days longer. This he did on the 20th or 21st day of August, 1936. Mrs. Lilly was stricken on the 22d of August, 1936. Mrs. Thompson found her prostrate on the floor in an unconscious condition. The neighbors rendered assistance. Dr. McChesney was summoned. Mr. Lilly had seriously aggravated his own condition by getting up and attempting to administer to his stricken wife. Four days later he died. When Mrs. Lilly rallied from unconsciousness, she was unable to speak. Mr. Lilly, when aware of his impending death, exacted a promise from Dr. McChesney that he would see that Mr. Lilly would not be buried "in a leaky box".

In that state of affairs this trusted, elderly physician sought the advice of Mr. Perkins. Mr. Perkins advised the procurement of a guardian for Mrs. Lilly. Dr. McChesney asked Mr. S. L. Dobie to accept the appointment as such guardian. Mr. Dobie was teller in the Peninsula Branch of the United States National Bank. He declined to accept such guardianship and told the doctor that he, Dr. McChesney, should take it.

On the 10th of September, 1936, Dr. McChesney verified a petition for the appointment of a guardian of Mrs. Lilly. This petition was prepared by Mr. Perkins upon information theretofore furnished by the doctor. A citation was issued and served upon Mrs. Lilly. Her condition improved. By the 14th or 15th of September she could talk in a whisper. A few days thereafter her voice returned. One witness testified that one time during the latter part of September, 1936, she heard Mrs. Lilly singing ''Annie Laurie''.

On the 23d day of September, 1936, Mr. Perkins arranged with Dr. McChesney to meet him in the court room of the Probate Department of the Circuit Court over which Judge Tazwell so ably presides. The doctor, however, found his way into the court room of the department over which Judge Lusk, now a member of this court, was then presiding. The result was Mr. Perkins explained to Judge Tazwell that he had expected the doctor to appear in person, but not having done so, Mr. Perkins stated the facts as he understood them. Manifestly the improvement in Mrs. Lilly's condition, subsequent to the preparation and filing of the petition for the appointment of a guardian for her, renders the testimony of proponents' witnesses outlined above as to her condition inconsistent with some of the statements made by Mr. Perkins. It must be remembered,

however, that the witness on whom Mr. Perkins was relying had failed to appear; that Mr. Perkins had received the information reflected in the petition prepared by him and at the time it was so prepared, the petition averred the true state of affairs as well as any petition could. The writer has given very careful consideration to the entire record and fails to find anything in it adversely reflecting upon Mr. Perkins' high ethical standing in the legal profession. The writer feels impelled to say of Dr. McChesney that every step he is shown to have taken in this case has been actuated by a sense of professional duty in behalf of his patients without the slightest inclination to gain anything whatever for himself. He shrank from acting as guardian for Mrs. Lilly. He had a will prepared at her instance by the terms of which he gained nothing whatever. The record also discloses that he had attended both Mr. and Mrs. Lilly as their physician for some years prior to their final illness. During that time, all the evidence available to anyone, except their bankers, was to the effect that the Lillys were very, very poor. These considerations result in but one conclusion, and that is that Dr. McChesney did his duty and told the truth.

It is true that a petition was prepared and filed on September 24, 1936, asking for authority to defray the expense of burying Mr. Lilly. In that petition, it is stated that Mrs. Lilly is "wholly unable to give any direction concerning the burial of said Franklin J. Lilly." When construed in the light of other references to her condition in the petition, the above quoted statement is plainly susceptible of but one meaning, namely, that at that time Mrs. Lilly, in person, could not make the selection of the site or place of interment or of the casket or the material rendering the grave waterproof or arrange with the various people necessarily attend-

ing upon the final obsequies. Such a task is far different from merely signing and publishing a will.

As to the charge of undue influence, contestants urge that the beneficiaries took charge of decedent, denied other acquaintances and friends admission to her presence and thereby prevented her from having impartial competent counsel and assistance in the matter of disposing of her estate.

As to removing Mrs. Lilly from the hovel in which she was living, when her husband died, to the home of Mr. and Mrs. Thompson, Dr. McChesney made the change. He took his patient in his automobile and transported her to the Thompson house. In his judgment, her condition was such that visitors should not be allowed. At all times, we must distinguish this case from those cases where the dominating and controlling agent profits by the terms of the will which ensues upon the course taken. Dr. McChesney had charge of the case. He directed that no visitors be allowed. The Thompsons merely followed his directions. When it came to the preparation of the will Dr. McChesney was not mentioned in it.

■ The charge of undue influence has not been proved.

■ Mr. S. G. McDonald, a handwriting expert, testified that in his opinion the signature upon the will in suit purporting to be that of Mrs. Lilly is not an assisted signature but a forgery. To adopt his opinion would necessitate discrediting the five persons who testified that they were eye witnesses to the execution of the will and also would require us to disbelieve all that Dr. McChesney said as to the request Mrs. Lilly made that he prepare just such a will as the one in suit, and that the one in suit was "very fine" and just exactly what she wanted.

It is true that Mr. and Mrs. Thompson were interested witnesses. The others at Mrs. Lilly's bedside on the day the will was executed were friends of Mr. and Mrs. Thompson and two of them were Mrs. Thompson's children; but Dr. McChesney was neither a relative nor an intimate friend. He had no selfish interest in the result and there is nothing in the record which indicates that he had any other motive than to serve his patients faithfully and honestly.

There is testimony by one witness that at one time Mrs. Lilly told the witness that her only means of support consisted of a remittance of $15 per month from Mrs. Lilly's brother, now deceased, who was the father of contestants herein. There is no corroboration whatever of this statement. On the contrary, there is a letter from the brother dated at about the time the purported statement is alleged to have been made wherein the brother earnestly solicits Mrs. Lilly to send him $100. It further appears that the brother himself was incapacitated so that he could not write and for that reason had his son, one of the contestants herein, write the letter just mentioned. The record discloses no other interest in or intimacy with Mrs. Lilly on the part of contestants or either of them.

Contrasting this aloofness on the part of contestants with the friendly interest, attention and service of Mr. and Mrs. Thompson in behalf of deceased, continuing over a period of years, it is evident that the will in suit makes a natural and logical disposition of the estate involved.

■ The legal principles involved are well settled. The determination of the issues depends upon an analysis of the testimony. The learned and experienced trial judge saw the witnesses and heard them testify. We think his conclusions are well supported by the record.

The order admitting the will in suit to probate as the last will and testament of Lucy J. Lilly, deceased, is affirmed.

It is ordered that neither party recover costs or disbursements on appeal.

BEAN, C. J., and BELT and ROSSMAN, JJ., concur.